

FILED
OCT 12 2016
Clerk, U.S. District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 16-03-BLG-SPW |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| GARRETT JAY COSTA, SR., | |
| Defendant. | |

Defendant Garrett Jay Costa, Sr. has moved to suppress statements made to law enforcement on July 9, 2015, and evidence gained thereafter. (Doc. 46). On October 6, 2016, this Court held a hearing on the motion. At the hearing, the Court heard testimony from F.B.I. Special Agent Brandon Walter. For reasons more fully discussed below, the Motion to Suppress is DENIED.

I.  **Background**

On July 9, 2015, a victim reported a rape to Officer Carolyn Morrison at the Crow Hospital. (Doc. 46-1). Officer Morrison learned that the victim had picked up an unknown suspect on Highway 451 in order to drive him to town. (*Id.*). The victim reported that she was raped in her white Suburban near the cemetery and veteran's complex. The victim identified the suspect as a Native American male,

1

long hair past the shoulder, wearing blue Nike shoes, black wind type pants, dark colored shirt and a beanie type hat. (*Id.*).

FBI Agent Brandon Walter received notification of the alleged rape at approximately 5:00 a.m., on July 9, 2015. He testified that as he drove from Billings, Montana, to Crow Agency, Montana, he received a description of the alleged assailant, which included stringy hair and blue Nikes. Because the victim had stated she picked up a hitchhiker, he did not believe she knew the assailant's identity.

Agent Walter testified that he went directly to the victim's house to collect evidence from her vehicle. There, he was told by law enforcement that a family member had reported seeing Costa, the victim's brother in law, sitting with the victim in her white Suburban earlier that morning. Agent Walter testified that, at that point, he had no leads on a suspect, and he considered Costa a potential witness. He and Bureau of Indian Affairs Agent Sharon Brown drove to Costa's mother's house to speak with Costa. Both agents walked to the door and knocked. Costa's mother answered the door and told the agents that Costa was sleeping. Agent Walter asked Costa's mother if she would wake Costa so they could speak with him.

When Costa came to the door, Agent Walter testified that he told Costa his his name had come up in an investigation and they needed to speak with him to

2

determine if he knew anything about the matter. Agent Walter testified that Costa agreed to speak with them and followed them to Walter's car. Costa got in the passenger side of the car, Walter got in the driver's seat, and Agent Brown got in the back seat behind Costa.

Agent Walter advised Costa that they were conducting an investigation and began asking Costa questions. (Doc. 52 at 1). After some preliminary questions like name and address, Agent Walters told Costa they were looking into something that happened "last night." (*Id.* at 2). Agent Walter told Costa he smelled alcohol on him and Costa confirmed that he had been drinking the night before. (*Id.* at 3). When Costa asked what was going on, Agent Walter told him that Costa's name came up, "not in a bad way," but that somebody had seen him and they did not know who was involved at that point. (*Id.*) After providing details about where he went and who he was with the night prior, Costa again asked, "What the hell is going on?" and why had his name come up. Agent Walters replied that they did not know, and they were trying to figure it out. (*Id.* at 9).

Costa continued to answer questions about how much alcohol he consumed and where and with whom he consumed it. (*Id.* at 11-16). Costa again asked what was going on. (*Id.* at 16). This time Agent Walter told Costa that he "didn't know what was going on" but that someone had been assaulted and Costa's name "came up in that." (*Id.*). Costa continued talking to Agent Walter about his activities the

3

night before. (*Id.*) Agent Walter asked Costa what he had been wearing the night before and Costa said he was wearing the same clothes and shoes from the night before. (*Id.* at 27). Costa said he had slept in his clothes and they were the same clothes from the night before. (*Id.* at 27). He also said he was wearing the same blue Nike shoes he wore the night before. (*Id.*). At that point, approximately 33 minutes into the interview, Agent Walter advised Costa of his rights and Mirandized him. (*Id.* at 28). Costa acknowledged his rights, that he understood them and agreed to answer questions without a lawyer present. (*Id.* at 29).

After Costa waived his rights, Agent Walter told Costa that an assault had happened the night before and they had heard his name but nobody had mentioned him as a suspect. (*Id.* at 30). Agent Walter eventually told Costa that his sister-in-law had been assaulted and someone had seen Costa in the car with her. (*Id.* at 32). After going over details of Costa's recollection of the previous night, Agent Walter told Costa he believed Costa was lying. (*Id.* at 39). He told Costa his shoes matched shoes found at the rape site. Costa denied being up at the site and denied any sexual activity with the victim. (*Id.* at 31-35, 40). Agent Walter testified that at this point he got out of the car and called FBI Agent Michele Stewart who was at the hospital with the victim. He asked Michele to confirm with the victim that Costa was the subject, which the victim did.

4

Agent Walter returned to his car and requested Costa's consent to take a DNA sample from him and a search of his yard for empty alcohol bottles. (*Id.* at 50-52). Costa consented. The interview lasted approximately one hour and twenty-six minutes. (*Id.* at 1, 61).

## II. Costa's Motion to Suppress

Costa moves to suppress the statements he made to law enforcement while he was in Agent Walter's car. He also moves to suppress the evidence gathered. In support of his motion, Costa makes three arguments: (1) *Miranda* warnings were required at the beginning of the interview; (2) Costa's waiver was involuntary because his will was overborne by the agents; and (3) Costa was under the influence of alcohol so he could not voluntarily waive his rights. The Court will address each argument separately.

### 1. Costa was not in custody for the first 33 minutes of the interview so *Miranda* warnings were not required.

Costa argues that he was subject to a custodial interrogation when Agents Walter and Brown questioned him in the car. The United States argues that Costa was not in custody for the 33 minutes before Agent Walter advised him of his *Miranda* rights, so no warning was necessary.

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-

incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). For *Miranda* to apply, a person must have been both in custody and subjected to interrogation. *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006).

"Custody" is a term of art that specifies circumstances considered to present a serious danger of coercion. *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012). A court determines whether a reasonable person in those circumstances would have felt that he was not at liberty to terminate the interrogation and leave. *Id.* This determination considers the objective circumstances; the focus is not on the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323 (1994). The Court examines the totality of the circumstances to determine whether a person was in custody for purposes of *Miranda*. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

The following factors are among those most relevant when determining whether a reasonable person would believe he could terminate the interrogation and leave:

    (1) the language used to summon the individual;

    (2) the extent to which the defendant is confronted with evidence of guilt;

    (3) the physical surroundings of the interrogation;

    (4) the duration of the detention; and

    (5) the degree of pressure applied to detain the individual.

*United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002). This list of factors is not exhaustive. The United States Supreme Court explained that the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning are other relevant factors that a court might consider in determining whether an interviewee was in custody. *Howes*, 132 S.Ct. at 1189.

### a. Language used to summon the defendant

The first *Kim* factor considers the "language used to summon the individual." 292 F.3d at 974. In determining whether a suspect is "in custody" for *Miranda* purposes, the Supreme Court has considered whether the suspect voluntarily approached or accompanied law officers understanding that questioning would ensue. *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1982)). Willingly agreeing to submit to an encounter with the police typically suggests an individual is not in custody. *Id.*

Here, Agent Walter testified that he and Agent Brown knocked on Costa's door and Costa's mother answered. When Costa came to the door, Agent Walter told Costa the agents needed to speak with him. Costa agreed. The interview happened in Costa's driveway, which was a location familiar to Costa. While Agent Walter admitted he did not tell Costa that he did not have to speak with the

7

agents, neither agent handcuffed Costa nor commanded him to speak with them. Neither agent brandished a weapon nor threatened Costa in any way. The Court finds that Costa made the choice to accompany the agents to Agent Walter's car to answer questions. This factor weighs in the United States' favor. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (a suspect who speaks with the police voluntarily, even at the invitation of the police, is not "in custody.").

### b. Confrontation with evidence of guilt

The second *Kim* factor considers "the extent to which the defendant is confronted with evidence of guilt." 292 F.3d at 974. This factor is not implicated here. Agent Walter did not confront Costa with any evidence of guilt during the first 33 minutes of the interview. In fact, prior to the *Miranda* warning, Agent Walter told Costa that law enforcement did not know the extent of Costa's involvement. During the hearing, Agent Walter explained that during the first 33 minutes of the interview, he thought Costa was merely a witness because at that time, Agent Walter thought the victim did not know her assailant, and Costa was a shirt-tail relative of the victim's. Accordingly, Agent Walter testified his objective with Costa was simply to obtain information about who the victim may have been with and where she went the prior night. There is no evidence that Costa was in custody based on confrontation with evidence of guilt.

8

### c. The physical surroundings of the interrogation

The third *Kim* factor considers "the physical surroundings of the interrogation." 292 F.3d at 974. The Ninth Circuit has held that an interrogation in a closed police vehicle may be considered custodial. *See United States v. Lee,* 699 F.2d 466, 468 (9th Cir. 1982). The United States asserts, however, that *Lee* is distinguishable because Costa was not confronted with any evidence of his guilt in the car, until after Agent Walter advised him of his *Miranda* rights. (Doc. 51 at 7). Also, the United States points out that no other agents were searching Costa's house at the time, like in *Lee*. (*Id.*)

The fact that Costa was interviewed in Agent Walter's car is not the sole consideration here. *Kim,* 292 F.3d at 980 ("Even when questioning occurs at a police station, there is not custody per se."). Additional factors must be considered. For example, the Ninth Circuit addressed a situation similar to Costa's in *United States v. Hudgens*, 798 F.2d 1234, 1235 (9th Cir. 1986). There, FBI agents met the defendant at an agreed upon location. The agents asked Hudgens to get into a "police-looking type vehicle," to which Hudgens agreed. *Id.* While in the car, Hudgens told the agents he had robbed a bank. The agents asked Hudgens specific questions about the robbery and got him a cup of coffee. *Id.* The interview lasted 45 minutes and Hudgens was not advised of his *Miranda* rights. *Id.* The Ninth Circuit held that although Hudgens was in a police car and was not

9

told he was free to leave, the interview was not coercive. *Id.* at 1237. The Court explained that Hudgens was not a suspect prior to the time he initiated the conversation with agents, and prior to his confession, the agents had no idea which robbery he had committed. Further, the agents did not use intimidating or coercive language during the interview. *Id.*

Here, like Hudgens, Costa voluntarily climbed into the front seat with Agent Walter. His door was not blocked or locked. It was daylight out and several people he knew passed by during the interview. Neither agent brandished a weapon nor locked the doors. In fact, during the interview, Costa pointed out familiar surroundings, including pointing out the motorcycle he had been working on the night before, and the area he thought he had thrown the alcohol bottles. *See id.*(Interviewing a defendant in familiar surroundings was much less coercive than an interrogation room).

Also like Hudgens, Costa was not a suspect initially. Agent Walter told Costa his name had come up "not in a bad way" and that the agents did not exactly know what was going on. Agent Walter testified that he did not consider Costa a suspect during the first 33 minutes of the interview because he thought the victim did not know her assailant. Considering the totality of the circumstances, an objective view of the circumstances demonstrates a reasonable person would have

felt free to terminate the questioning and leave. This factor favors the United States.

### d. Duration of the detention

The fourth *Kim* factor considers the "duration of the detention." 292 F.3d at 974. Approximately 33 minutes passed from when Costa got in the car to the time Agent Walter read Costa his *Miranda* rights. This, combined with the fact that the interview was "conducted in an open, friendly tone," Costa "participated actively," and the "conversation was plainly consensual," leads the Court to conclude this factor favors the United States. *See United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) (finding a two and a half hour interrogation non-custodial when the interview was conducted in a friendly open tone, the defendant actively participated and the conversation was plainly consensual); *see also Hudgens*, 798 F.2d at 1236–37 (holding that the lack of handcuffs and other physical restraints, together with the fact that the detention lasted only forty-five minutes supported a finding of no custody).

### e. Degree of pressure applied to detain individual

There is no evidence that Agent Walter or Agent Brown used physical or psychological pressure to keep Costa in the car. Agent Walter did not threaten or place Costa in handcuffs, brandish his weapon, or restrain Costa in any way. Costa seemed comfortable; he joked about borrowing Agent Walter's shoes, said "I know

11

you" to Agent Brown, spoke with Agent Walter about other cases, and asked for coffee. Nothing about Costa's behavior indicates to the Court that he felt pressured, physically or psychologically, to stay in the vehicle. Under the circumstances, a reasonable person would have believed that he could terminate the interview and leave. This factor favors the United States.

### 2. Costa's post-*Miranda* statements were voluntary

Costa claims that because he was not at liberty to leave, his statements and evidence provided even after he was advised of his *Miranda* rights should be suppressed. (Doc. 47 at 11). Costa asserts that his will was overborne by the agents' coercive tactics, including a deliberate two-part interrogation where the agents used his unwarned statements against him after the *Miranda* warning. (*Id.*). He also asserts that his waiver was not voluntary because he was still under the influence of alcohol from the night before. (*Id.* at 12). The United States argues that the interview recording proves the agents did not coerce Costa into making any statements or admissions. (Doc. 51 at 11-12). The United States also argues that Costa's intoxication did not render his waiver or statements involuntary. (*Id.*).

In *United States v. Lewis*, 833 F.2d 1380, 1386–87 (9th Cir. 1987), the Ninth Circuit discussed a trial court's responsibilities in determining the admissibility of a defendant's statement given after the *Miranda* warning. The Court said:

> Under the Supreme Court's analysis in *Elstad*, in determining the admissibility of a defendant's statement given after the *Miranda* warning, the court should look first to determine whether the statement made by a defendant before the *Miranda* warning was actually coerced in violation of the fifth amendment. If it was, then the court must suppress the evidence unless the violation was sufficiently attenuated to permit the use of the evidence under the standards announced in *Brown [v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)]. If, on the other hand, the prior statement was voluntary in the sense that it was not coerced in violation of the fifth amendment, though obtained in technical violation of the *Miranda* requirements, the court should suppress the statement given after the *Miranda* warning only if the court finds that the subsequent statement was not voluntarily made. This decision would take into consideration the surrounding circumstances, the combined effect of the entire course of the officer's conduct upon the defendant, including the effect of his previously having made a confession, and the manner in which the officers utilized this prior confession in obtaining a second confession.

*Id.* at 1386 (citing *United States v. Wauneka*, 770 F.2d 1434, 1440 (9th Cir. 1985)). In other words, if the prewarned statement was voluntary, then the post warning confession is admissible unless it was involuntarily made despite the *Miranda* warning. *United States v. Williams*, 435 F.3d 1148, 1153 (9th Cir. 2006).

The test for determining whether a statement was voluntary is "whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998) (internal quotation omitted).

13

The defendant's state of mind is not enough to render a statement involuntary. *Colorado v. Connelly*, 479 U.S. 157, 165-66 (1986). Instead, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Id.* at 167.

### a. Costa's will was not overborne by the agents

As noted above, there is no evidence that the interviewing agents applied physical or psychological pressure to coerce Costa's statements. Costa received the *Miranda* warning and signed an advice of rights form after reading a portion of it aloud. In total, the interview lasted about an hour and half. While this is a fairly lengthy amount of time, "coercion typically involves far more outrageous conduct." *United States v. Haswood*, 350 F.3d 1024, 1028 (9th Cir. 2003).

After listening to the interview, this Court finds that Agent Walters was cordial and conversational with Costa. Even after Agent Walters suspected Costa was lying, he did not become aggressive or threatening or display any other behavior that would coerce Costa to speak. The interviewing agents did not apply physical punishments such as denying food or sleep. In fact, the agents gave Costa a bottle of water. In reviewing the totality of the circumstances, the Court finds that Costa voluntarily provided his statements to the agents.

Costa argues that the agents used illegal "beachhead" tactics to obtain information against him earlier in the interview, and then used that information to

14

obtain incriminating statements from him after giving him *Miranda* warnings. *See Pope v. Zenon*, 69 F.3d 1018, 1024 (9th Cir. 1995) (amended 1996) (recognizing that while initial questioning that deliberately employs improper tactics may not coerce a suspect into an immediate confession, such questioning may still have a coercive effect on subsequent statements).

The Court rejects this theory. In *Pope*, the detectives received some incriminating information from the defendant prior to advising him of his *Miranda* rights that "set him up to talk to them notwithstanding their advisement of rights." *Id.* Agent Walter did not engage in the conduct prohibited by *Pope*. As noted above, Agent Walter did not suspect Costa was a suspect until 33 minutes into the interview, at which time he advised Costa of his *Miranda* rights. Unlike in *Pope*, Agent Walter did not discuss "evidence" that he had against Costa in order to elicit incriminating statements and make him fearful, nor was he even attempting to elicit a confession. Rather, Agent Walter testified at the hearing that Costa was the last person with the victim so Agent Walters believed he potentially had information about who the victim was with and where she had been before the rape. The Court finds Agent Walter's interview distinguishable from that in *Pope*.

### b. Costa's claim that his statements were not voluntary because of his intoxication is not credible

Costa argues that his statements may not be admitted because they were not the product of a rational intellect and free will, as evidenced by his blood alcohol

15

content. (Doc. 47 at 12). Even assuming Costa was under the influence on July 9, 2015, the Court finds he acted intelligently, knowingly, and voluntarily.

After listening to the interview, the Court finds that, despite some mumbling, Costa was able to communicate clearly with Agents Walter and Brown about the events of the night before. The recording of Costa's interview on July 9, 2015, demonstrates that Costa's statements were the product of a rational intellect and free will. *Shackleford v. Hubbard*, 234 F.3d 1072, 1080 (9th Cir. 2000) (finding that the fact that a suspect is under the influence of drugs or medication is irrelevant if the suspect's statement was the product of a rational intellect and a free will).

Agent Walter read Costa his *Miranda* rights, which Costa stated he understood, Costa read a sentence to the agents acknowledging as much, and he voluntarily spoke with the agents. In reviewing the totality of the circumstances, the Court finds that Costa's statements to law enforcement were voluntary.

### III. Conclusion

For the reasons stated above, Costa's Motion to Suppress (Doc. 46) is DENIED.

DATED this 12th day of October 2016.

_Susan P. Watters_
SUSAN P. WATTERS
United States District Judge